IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HON. LORI HACKENBERG, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 4:25-CV-01024 |
| | : | |
| DANIEL BOZIN, | : | Judge Matthew W. Brann |
| BOZIN MEDIA GROUP, LLC d/b/a | : | |
| BOZIN MEDIA, and | : | |
| BOZIN HOLDINGS, LLC, | : | |
| Defendants. | : | JURY OF 12 DEMANDED |

**BRIEF IN IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT
OR FOR AN ENTRY OF JUDGMENT FILED PURSUANT THE
UNIFORM PUBLIC EXPRESSION PROTECTION ACT**

## INTRODUCTION

On June 6, 2025 Plaintiff Lori Hackenberg ("Hackenberg"), the sitting President Judge of Snyder-Union Counties Court of Common Pleas took the extraordinary step of initiating this SLAPP[1] action against Defendants.  This is doubly noteworthy as Hackenberg issued a bench warrant against Defendant Daniel Bozin ("Bozin") in criminal proceedings against Bozin in the Court of Common Pleas.  Defendants now seek relief from Hackenberg's SLAPP suit under Pennsylvania's Uniform Public Expression Protection Act ("PA-UPEPA")[2], 42 Pa.C.S.A. § 8340.11, *et seq.* and other avenues provided by the Federal Rules of Civil Procedure.

Due to the recent enactment of PA-UPEPA by the General Assembly and the fact that the Third Circuit has not yet spoken regarding UPEPA, Bozin Defendants' Special Motion [Doc. 16] presents more than ordinarily complex legal questions for the Court's consideration.  Prior to examining the substantive questions regarding Bozin Defendants' entitlement to relief under PA-UPEPA and/or the Federal Rules of Civil Procedure, Defendants will address the following issues:

A.    Interaction between the *Erie* Doctrine and PA-UPEPA.

B.    The framing of Defendants' special motion in light of *Erie* issue.

C.    The parts of the record which may be considered by the Court.

---

[1] Strategic Lawsuit Against Public Participation.

[2] Defendants have abbreviated the statute as UPEPA in previous filings.  Defendants now adopt the style PA-UPEPA as proposed by Michael Berry and Kaitlin M. Guerney, "Pennsylvania Joins States Enacting Tough Anti-Slapp Protections:  The New Uniform Public Expression Protection Act,"  96 Pa. Bar Ass'n Q. 1 (2025) (copy attached).  This abbreviation will alleviate confusion when comparisons are made between PA-UPEPA and enactments by other states.

## STATEMENT OF THE CASE

I.    Procedural History.

Hackenberg initiated this matter by filing a Complaint [Doc. 1] on June 6, 2025 in which she asserted a single claim of false light invasion of privacy.  On June 12, 2025 the Court entered an Order [Doc. 5] requiring the parties to confer in good faith prior to filing motions to dismiss.

On June 18, 2025 following communication between counsel, Hackenberg filed her First Amended Complaint [Doc. 7] revising some factual allegations but adding no additional causes of action.   Bozin Defendants responded by filing their first Special Motion on July 8, 2025. [Doc. 11]

With the consent of Bozin Defendants, Hackenberg filed a Motion for leave to amend her pleading on July 17, 2025.  [Doc. 13]  The Court granted leave to amend by Order dated July 21, 2025 [Doc. 14] which also dismissed the first Special Motion [Doc. 11] as moot and without prejudice to refile.   Hackenberg filed her Second Amended Complaint ("SAC") [Doc. 15] on July 23, 2025.  The SAC added a defamation claim.

Bozin Defendants responded by filing a second Special Motion [Doc. 16] on August 4, 2025.   Bozin Defendants accompanied their Special Motion with a Statement of Undisputed Material Facts ("SUMF").  [Doc. 18]  Bozin Defendant now submit their Brief in support of the Special Motion.

II.    Facts of the Case.

On July 23, 2025, Plaintiff Lori Hackenberg ("Hackenberg") filed a Second Amended Complaint ("SAC") [Doc.15] alleging that Defendants cast Hackenberg in a false light by:

A.    Having a "sham" change.org petition calling for Hackenberg's impeachment and asserting that "the tragic loss of six year old Adam Gitter reveals the dire consequences of bias and corruption."  [Doc. 15, ¶ 40].

B.    Linking, via Defendants' fightcorruptionpa.com website and Facebook page to a change.org petition. The change.org petition contains an image of Hackenberg with a pair of stylized bloody hands, blood spatters, and the caption, "HOW MANY MORE KIDS ARE YOU GOING TO MURDER."  [Doc. 15, ¶ 41]

C.    Publishing (at unspecified locations) the hashtags #kidsforcash, #courtcorruption, #endjudicialabuse, and #savekids with links to other publications about Hackenberg.  [Doc. 15, ¶ 42]

D.    Manipulating the "Impeach Lori Hackenberg" social media page (platform unspecified) and "promoting" malicious images such as (presumably) one depicting Hackenberg with horns, $100 bills in front of gagged children, and the legend, "Judge Lori Hackenberg: Where Children are Auctioned for Profit." Hackenberg does not allege that Defendants created or published the images. [Doc. 15, ¶ 43]

E.    Bozin Media Group paid for and "propagated", under the social media account, "Impeach Judge Lori Hackenberg of Union and Snyder Counties,"  an image stating "Corruption in Pennsylvania COST$ YOU.  #stopthehack."  [Doc. 15, ¶ 43]

F.　　Hiring an aircraft to fly over a Snyder County Night Out (on an unspecified date), towing a banner reading, "impeach Judge Hackenberg -fight-corruptionpa.com" [Doc. 15, ¶ 47]

G.　　Attempting to "blackmail" Hackenberg with images depicting Hackenberg's daughter consuming alcohol while underage.  Hackenberg does not allege that Bozin actually published the images to the public.  [Doc. 15, ¶¶ 45-46].

H.　　Making a series of post-complaint social media posts regarding facts and circumstances around his various involvements with the criminal justice system in Snyder County.[3]  [Doc. 15, ¶¶ 55, 59]

The Change.org petition referenced in paragraph 40 of the SAC appears to be published by Jane Smith as "Petition Starter."  [Doc. 16-1]  Defendants did not originate and do not maintain or otherwise exercise ownership and/or control of the Change.org petition.  [Doc. 16-2] The Change.org petition was created on September 9, 2023.  [Doc. 16-1]  Criminal proceedings in Snyder County were not initiated against Bozin until November 11, 2023. [Doc. 16-3] Further, the petition does not appear to contain the text, "tragic loss of six year old Adam Gitter reveals the dire consequences of bias and corruption" quoted by Hackenberg at paragraph 40 of the SAC.  [Doc. 16-1]

---

[3] Hackenberg goes to some pains to point out that Bozin made the posts "[a]fter being notified this litigation was filed . . ." [Doc. 15, ¶ 55] and that Bozin posts "[e]ven to this day, after Bozin had this lawsuit in hand . . ." [Doc. 15, ¶ 59].  It would seem that Hackenberg's primary purpose of including this material originally in the FAC and now in the SAC is to express her frustration that her strategy of attempting to silence Bozin is retaliatory litigation has not succeeded in gagging Bozin.

Defendants did not create or publish the image depicted at paragraph 41 of the SAC. See Exhibit 2. Rather, Jane Smith as originator of the change.org petition appears to have created and published that image. [Doc. 16-4] Defendants did not create or publish the first image (depicting Hackenberg in horns, dollar bills, gagged children, and the caption "Judge Lori Hackenberg: Where Children are Auctioned for Profit") depicted at Paragraph 43 of the SAC. See Exhibit 2.

Defendants did create the text of the second image (titled "CORRUPTION IN PENNSYLVANIA COST$ YOU") depicted at paragraph 43 of the SAC though a third party added the QR code. See Exhibit 2. However, Defendants do not own, operate, maintain, or exercise administrative control over the Facebook page Impeach Judge Lori Hackenberg of Union and Snyder Counties, PA. See Exhibit 2.

Defendants have not used the hashtags indicated in paragraph 42. See Exhibit 2.

Defendants did hire an aircraft to fly a banner as indicated in paragraph 47. Further, Defendants created and maintains the website, FightCorruptionPA.com. See Exhibit 2. The website mentions Hackenberg on its "About" page. [Doc. 16-5] The website further mentions Hackenberg in the "Stories > Adam Gitter" page. [Doc. 16-6]

Bozin did not influence, manipulate, or otherwise cause Elena Belogolovsky to publish any communications or material relating to Hackenberg. See Exhibit 2. Belogolovsky has a long history or animosity toward Hackenberg before Bozin was criminally charged. Elena Belogolovsky has been involved in custody litigation in Union County, Pennsylvania since her estranged husband, Leonard J. Gitter ("Gitter") filed a complaint on November 15, 2017. [Doc. 18-2] From filing in 2017 through discontinuance in 2024, the litigants filed some 834 pages of

filings. [Doc. 18-2]   The subject of the litigation was Gitter's and Belogolovsky's son, A.G. [Doc. 7, ¶¶ 28, 29, 30; Doc. 11-5, pp. 1-3]

Hackenberg presided over the custody case and ultimately awarded primary physical custody to Gitter. [Doc. 7, ¶ 29]   A.G. died on March 2, 2024 while in the custody of Gitter. [Doc. 7, ¶ 29]

On appeal the Superior Court noted that "Mother's call for President Judge Hackenberg's recusal and transfer of venue has been recycled at every turn, including for a third time on appeal before this Court." [Doc. 7, ¶ 30]. [Doc. 18-3]    In its February 21, 2024 Opinion, the Superior Court noted that Belogolovsky filed a prior appeal to the Superior Court seeking Hackenberg's recusal. [Doc. 18-3, p.2, fn. 1].

On September 1, 2022 Belogolovsky filed a motion for Hackenberg's recusal ("2022 Recusal Motion"), asserting various arguments which Belogolovsky found indicative of bias against her on the part of Hackenberg. [Doc. 18-4]

On May 15, 2023, Belogolovsky filed another Motion to Recuse Honorable Judge Lori R. Hackenberg and Transfer of Venue ("2023 Recusal Motion"). [Doc. 18-5]   In the 2023 Recusal Motion, Belogolovsky asserts that Hackenberg's ruling of August 11, 2022 granting primary physical custody of A.G. to Gitter "favors the wealthy parent and forces the financially disadvantaged Mother to bear an unmanageable financial burden to see her child." [Doc 18-5, p. 3, ¶ 12 (a)]   Belogolovsky asserts that the August 11, 2022 Order "reduces the Child to a mere commodity that can be bought and sold to the highest bidder, constituting 'a kids for cash' and 'justice for sale.'" [Doc. 18-5 5, p. 3, ¶ 12 (a)]   Belogolovsky mentions her efforts to seek Hackenberg's recusal in companion child support litigation. [Doc. 18-5, p. 3, ¶ 12 (a), fn. 5]

On June 30, 2023 Belogolovsky filed a Defendant's Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b) ("Concise Statement"). [Doc. 18-6]In the Concise Statement, Belogolovsky asserts, inter alia, that Hackenberg:

> a. "perpetuated Judge Hackenberg's relentless financial abuse against Mother." [Doc. 18-6, ¶ 2 (e)]
>
> b. "displayed Judge Hackenberg's collaboration with Father and his lawyer to bankrupt Mother and strip her of custody and her abuse of the prestige of judicial office by actively advancing Father's interests." [Doc. 18-6, ¶ 2 (f)]
>
> c. "allowing only the wealthy parent to get access to courts and justice and silencing the financially weaker parent." [Doc. 18-6, ¶ 2 (g)]
>
> d. "display[ed] antisemitism and anti-Israel bias." [Doc. 18-6, ¶ 4]

Belogolovsky made each of the statements mentioned above prior to the initiation of the Snyder County criminal case against Bozin on November 20, 2023 [Doc. 11-3, p. 1]

Bozin is the sole member of Bozin Media Group, LLC ("Bozin Media") [Doc. 15, ¶ 21; Doc. 16-2, ¶ 1] and the sole member of Bozin Holdings, LLC ("Bozin Holdings"). [Doc. 7, ¶ 22; Doc. 16-2, ¶ 1]

On February 1, 2024 Hackenberg issued a bench warrant against Bozin. [Doc. 7, ¶ 25; Doc 16-3]  Bozin has not been convicted in the Snyder County criminal prosecution. [Doc. 16-3, p. 2]

Hackenberg accuses Bozin of making, linking to or being involved with the following communications:

A.    www.fightcorruptionPA.com.

Bozin paid for the creation and publication of the www.fightcorruptionPA.com website. [Doc. 15,    39 ; Doc. 16-2, ¶ 11]    The www.fightcorruptionPA.com website references Hackenberg on its "About" page, showing a picture of Hackenberg wearing a campaign sticker. The About page contains the hashtag "#STOPTHEHACK" and contains the following language:

> Are your children safe?  In Union and Snyder Counties, they might not be.  Under the shadow of judicial figures like Judges Lori Hackenberg and Mike Piecuch, our community is facing unprecedented threats.  Corruption and incompetence within our local justice system endanger the well-being of our children and their families.

[Doc. 16-5, p. 1]

The About page asserts that Hackenberg is "[a] judge who has made dangerous and life-altering decisions, including the tragic case of Adam Gitter, whose life was cut short due to her negligence.  Her luxurious lifestyle stands in stark contrast to the devastation she leaves behind." [Doc. 16-5, p. 3]

The www.fightcorruptionPA.com website refers to Hackenberg on its "Adam Gitter" page in reference to custody litigation involving Elena Belogolovsky.   The first reference indicates, "[Belogolovsky] claims that the court's decisions, particularly those of Judge Lori R. Hackenberg, which were influenced by a questionable custody evaluation from Dr. Arnold T. Scheinvold, led to catastrophic consequences for her son."  [Doc. 16-6, p. 2]  The Adam Gitter page further states, "[Belogolovsky] accuses Judge Hackenberg of systematically disadvantaging her, forcing her to bear the costs of visiting Adam in Florida despite her unemployment, thus severely limiting her ability to maintain a meaningful relationship with her son.  This imbalance, she argues, showcases a judicial bias towards wealthier parties, resulting in unfair and tragic

consequences." [Doc. 16-6, p. 2]   The Adam Gitter page links to a video of Belogolovsky making a statement regarding her grievances    [Doc. 16-6, p. 3] and to a change.org petition entitled "impeach-judge-lori-hackenberg-of-union-and-snyder-counties-pa." [Doc. 16-6, p. 3]

      B.    <u>Impeach Judge Lori Hackenberg of Union and Snyder Counties, PA petition</u>.

There is a change.org petition entitled "IMPEACH JUDGE LORI HACKENBERG of Union and Snyder Counties, PA." [Doc. 15, ¶ 40; Doc. 16-1, pp. 1-24]   The petition shows a picture of Hackenberg seated and wearing a campaign sticker. [Doc. 16-1, p. 1]   The petition was created on September 9, 2023. [Doc. 16-1, p. 6]  The petition has 2,170 verified signatures. [Doc. 16-1, p. 1]

The petition contains the following text, written as a first person narrative:

> In August 2022, Judge Hackenberg shattered my world and hijacked my child's wellbeing. She sent my child, who was born and raised in PA miles away to live in another state with his father, granting me bi-weekly visits in another state that come with a staggering cost- flights, accommodations, you name it, all on my unemployed dime. How is any employment feasible with such bi-weekly interstate travel schedule? A mother shouldn't have to choose between her livelihood and her child's embrace. Yet, the father, with his millions of dollars annual income, doesn't spend a cent and doesn't need to fly anywhere. Motherhood is not a luxury for the wealthy only. This isn't justice; this is a war on the right of every child to know their mother's love, unfiltered by the thickness of a wallet. It's time we reclaim the scales of justice for every mom and every child stripped of their bond by the corrupted Judge Hackenberg who rewards wealth over love. I'm fighting for my child and for every family torn apart by Judge Hackenberg who puts a price tag on love. Raise your voice against Judge Hackenberg's 'kids for cash' scheme; in her courtroom, our children become pawns and justice is sold to the highest bidder.

[Doc. 16-1, p. 2]

The petition starter is listed as Jane Smith.   [Doc. 16-1, p. 3]   None of the Bozin defendants originated, maintain or otherwise exercise ownership, administration and/or control of, or receive funds from the petition.  [Doc. 16-2, ¶ 2]

The petition contains an update page showing an image depicting Hackenberg with two stylized bloody handprints and the legend, "HOW MANY MORE KIDS ARE YOU GOING TO MURDER."  [Doc. 15, ¶ 41; Doc. 16-4, p. 1]   Hackenberg does not allege Defendants created the bloody handprints image.  [Doc. 15, ¶ 41]  Defendants did not create the bloody handprints image.  [Doc. 16-2, ¶ 3]

The fightcorruptionpa.com website does not link directly to the update page.  [Doc. 16-6, p. 2]  Rather, the fightcorruptionpa.com website links directly to the main petition page.  [Doc. 16-6, p. 2]  From the main petition page, a viewer must access another link to the update page in order to view the image shown in paragraph 41 of the SAC.  [Doc. 16-1, p. 5]

C.    Impeach Judge Lori Hackenberg of Union and Snyder Counties, PA Facebook.

There is a Facebook page entitled "Impeach Judge Lori Hackenberg of Union and Snyder Counties, PA."  [Doc. 15, ¶ 41].  The Bozin defendants did not originate, maintain or otherwise exercise ownership, administration and/or control of the Facebook page "Impeach Judge Lori Hackenberg of Union and Snyder Counties, PA."  [Doc. 16-2, ¶ 5]

The Facebook page contains a banner photo showing Hackenberg, a stylized pair of bloody hands, and the word "Murderer."   [Doc. 16-2, ¶ 41]   The Facebook page contains a profile picture depicting Hackenberg with photoshopped accoutrement of demon-hood such as horns and glowing eyes.   The profile picture shows three gagged children, $100 bills and the legend, "Judge Lori Hackenberg:  Where Children Are Auctioned for Profit."  [Doc. 15, ¶ 43]

The Bozin defendants did not create, pay for, or publish the image of Hackenberg with horns.  [Doc. 16-2, ¶ 4]  Bozin did create an image which was posted to the Impeach Facebook page on August 8, 2024.    The image contains various statements such as "Corruption In Pennsylvania Cost$ you," "#stopthehack," "Scan here to learn more about the ongoing fight to bring back 'For the people By the People,'" "Paid for by Bozin Media Group & Explorative Efforts to improve PA."  [Doc. 15, ¶ 43, Doc. 16-2, ¶ 4].   The image was modified by a third party to add a QR code.  [Doc. 16-2, ¶ 4]

D.    Pictures of underage drinking.

There is no allegation that the Bozin Defendants published images of Hackenberg's daughter drinking underage.  [Doc. 15, ¶¶ 45-46]  Images appear on various social media pages which appear to depict Hackenberg's daughter and other individuals doing shots, mixing drinks and bottle of rosé sparkling wine.  [Doc. 18-1]  The images were posted by an individual with the initials, B.M.  [Doc. 18-1]

E.    Airplane banner.

Bozin hired an aircraft to fly about the Snyder County Night Out towing a banner which read, "impeach Judge Hackenberg - fight-corruptionpa.com."  [Doc. 15, ¶ 47; Doc. 16-2, ¶ 6]

F.    Bozin's Social Media Posts.

Bozin made the social media posts depicted in paragraphs 55 and 59 of the Second Amended Complaint.[4]  [Doc. 15, ¶¶ 55 and 59; Doc. 11-2, ¶ 7]

_____

[4] The order of the posts set forth here varies from the Second Amended Complaint.  The SAC does not set them forth in strict chronological order.

The first post of June 9, 2025 at 5:06 AM, which received 109 views, reads:

> *So let me get this straight
> I sue Snyder County.
> They threaten me with charges.
> I threaten to go to @CNN.
> Suddenly Judge Hackenberg sues me, calls me a criminal in the press,
> and melts down like it's Real Housewives of Snyder County.
>
> This ain't justice.  It's Kids for Cash 2.0.

[Doc. 15, ¶ 55]

The second post of June 10, 2024 at 9:20 AM, which received 15 views, reads:

> You can't hide a 2018 cover-up, a ghost warrant, and a RICO trail across three
> states - not anymore.  Hackenberg and her circle underestimated the one thing
> they should have feared:  documentation.

[Doc. 15, ¶ 55]

The third post of June 10, 2025 at 9:21 AM, which received 13 views, reads:

> When the silence breaks after 11 months, it's never by accident.  That's called
> damage control.  The extortion plan failed - and now they're scrambling.  Snyder
> County knows exactly what they did.  So does Hackenberg.

[Doc. 15, ¶ 55]

The fourth post of June 10, 2025 at 9:22 AM, which received 12 views,  reads:

> The moment I said @cnn threats started, the lawsuits dropped, and the spin
> campaign began.  That's not justice.  That's panic.  And it's all connected -
> Hackenberg, Snyder County, and the 2018 setup.

[Doc. 15, ¶ 55]

The fifth post of June 10, 2025 at 11:59 AM, which received 11 views, reads:

> This is the kid who said 'f*** Mark Bailey,' made threats to police, lied to
> everyone, and illegally had a gun - yet now he's the one they protect.  He's the
> reason I was told to sue, then turned on me to cover for his grandma.  Even after a

3-year court order for harassment, he plays the victim.  His mom's extortion plot with Judge Hackenberg failed when I threatened CNN.   And she admitted everything - on tape."

[Doc. 15, ¶ 55]

The sixth post of June 11, 2025 at 4:00 AM, which received 25 views, reads:

Sarah Shellenberger admitted she was behind the Hackenberg lawsuit, the Geisinger criminal charges, and getting me fired-pure retaliation. She said if I found out, she was afraid I'd come after her civilly and criminally.  I did.  That's why Bozin v. Shellenberger was filed months ago #caught . #Corruption

[Doc. 15, ¶ 55]

The seventh post, undated and viewership not indicated, reads:

#FightCorruptionPA the hidden secret what this is all about. #hackenberg

The post contains a meme depicting a Middleb! [sic] Police officer carrying an "EXTORTION

FILE" and the following text:

WHERE'S
THE TAPE?

IT WAS THE
MIDDLEBURG
POLICE CHIEF

IT WAS AN
EXTORTION
FILE TO
USE
LATER
ON WHEN
THEY NEEDED
IT

[Doc. 7, ¶ 55]

The eighth post, undated and which received one like, reads:

> They accused me of harassment
> for reporting a crime.
> Now they're the ones doing the stalking - in court.

The post contains a meme with the following language:

> ONLY IN
> AMERICA:
>
> A JUDGE SUES
> A DEFENDANT-
> FOR CALLING OUT
> HER "BAD DECISION"
> THAT LEFT
> A CHILD DEAD.
>
> FIRST AMENDMENT ON TRIAL?
>                                    CNN

[Doc. 7, ¶ 55]

## PA-UPEPA AND THE *ERIE* DOCTRINE

On July 17, 2024, Governor Josh Shapiro signed into law Act 72, the Uniform Public Expression Protection Act ("PA-UPEPA"), 42 Pa.C.S.A. § 8340.11, *et seq*, with immediate effect.  In enacting PA-UPEPA, the General Assembly found that "[i]t is in the public interest to encourage continued participation in matters of public significance.  This participation should not be chilled through abuse of the judicial process."  42 Pa.C.S.A. § 8340.12(2).  To accomplish its stated goals, the General Assembly passed a package of substantive and procedural provisions.

In general terms, the Act itself considers the substantive rights to be:

1.    A broad grant of immunity for those engaged in protected public expression.  See §§ 8340.13; 8340.14; 8340.15.

2.    A compulsory award of counsel fees, court costs and expenses of litigation should a defendant be determined to be immune or should a plaintiff voluntarily discontinue an action.  § 8340.18 (a)(1) and (2).[5]

3.    Immediate interlocutory appeal of any order making a determination regarding immunity.  § 8340.17.

These substantive sections were made immediately effective upon signature by Governor Shapiro.  Act 72 § 7 (2).

Act 72 considered the provisions of § 8340.16 to be procedural.   These provisions generally relate to the filing and disposition of a special motion to test immunity, limited discovery on such a motion, and a stay of proceedings and exceptions thereto during the

---

[5] The General Assembly is considering proposed legislation which would permit recovery of "operating costs" in the form of increased insurance premiums for policy's covering attorney fees, court costs or other expenses of litigation.  See 2025 H.B. 1771.

pendency of a special motion.  See § 8340.16 generally.  The procedural provisions of § 8340.16 take effect after action by the Pennsylvania Supreme Court, the General Assembly, the Administrative Office of Pennsylvania Courts, and the Legislative Reference Bureau.  Act 72 §§ 3 and 7.  As of the date of filing of this Brief, PA-UPEPA is pending before the PA Supreme Court's Civil Rules Committee but no proposed rules have been released for public comment.[6]

The General Assembly's opinion of which provisions are substantive or procedural notwithstanding, the Court must assess PA-UPEPA's applicability in federal court under the doctrine announced by the Supreme court in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

As a general rule, "[a] federal court sitting in diversity must apply state substantive law and federal procedural law."  *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262 (2011) (citing *Erie* at 262).  "Under Erie, a court assesses the substantive/ procedural dichotomy with the objective that 'the outcome of the litigation in the federal court [will] be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.'"  *Id*. at 302 (citing *Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945)).  "This focus on whether application of a state rule will or may affect the outcome is intended to serve 'twin aims': 'discouragement of forum shopping and avoidance of inequitable administration of the laws.'"  *Chamberlain v. Giampapa*, 210 F.3d 154, 159 (2000) (citing *Hanna v. Plumer*, 380 U.S. 460, 468 (1965)).

---

[6] Counsel made a telephone call to the Civil Rules Committee on August 15, 2025.  The Committee only indicated that the matter is pending and could provide no additional information.  The Committee's website does not indicate proposed rules available for public comment.  See https://www.pacourts.us/courts/supreme-court/committees/rules-committees/civil-procedural-rules-committee

"Under *Hanna*, a federal court sitting in diversity first must determine whether a Federal Rule directly 'collides' with the state law it is being urged to apply." *Id.* (citing Hanna at 470-74). "If there is such a direct conflict, the Federal Rule must be applied if it is constitutional and within the scope of the Rules Enabling Act." *Id.* (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 n. 7 (1996).[7] "If a 'direct collision' does not exist, then the court applies the Erie rule to determine if state law should be applied." *Id.* (citing *Hanna* at 470).

"In deciding whether a Federal Rule 'directly collides' with a state law, the federal court sitting in diversity must consider whether the scope of the Federal Rule is 'sufficiently broad to control the issue before the Court,' [. . .] 'thereby leaving no room for the operation of [the state] law," *Id.* (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749–50(1980); Burlington Northern R.R. Co. v. Woods, 480 U.S. 1, 4–5 (1987). "Although the Rules should be given their plain meaning and are not to be construed narrowly in order to avoid a direct collision, [. . .] 'a broad reading that would create significant disuniformity between state and federal courts should be avoided if the text permits.'" *Id.* (citing *Walker* at 750, n.9; *Stewart Org., Inc. v. Ricoh*, 487 U.S. 22, 37–38 (1988). "'Federal courts have interpreted the Federal Rules, however, with sensitivity to important state interests and regulatory policies.'" *Id.* (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 n. 7 (1996).

---

[7] In this case, the relevant federal rules are Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 56. Bozin Defendants concede that both rules are authorized by the Rules Enabling Act and are consistent with the Constitution.

The Third Circuit has not yet had the opportunity to announce its opinion as to whether PA-UPEPA or any other state enactment of UPEPA is applicable in federal court.[8]  Three other District Courts in the Third Circuit have issued opinions on the applicability of UPEPA with varying degrees of receptiveness.  These are:

1.   *Paucek v. Shaulis*, 2025 WL 1298457 (D.N.J. May 6, 2025).

2.   *Jakes v. Youngblood*, 2025 WL 1208276 (W.D.Pa April 25, 2025).

3.   *Salaam v. Trump*, 2025 WL 1789648 (E.D.Pa. June 27, 2025).

Bozin Defendants will examine the holdings in each of these cases.

1.   *Paucek*.

Of the Third Circuit districts which have written on UPEPA and the *Erie* Doctrine, the New Jersey District has shown the most receptiveness in its analysis of NJ-UPEPA, N.J.S.A. 2A: 53A-49, *et seq*.  The New Jersey District noted that "asking whether anti-SLAPP statutes do or do not apply in federal court is not the pertinent question. The correct question is 'whether a particular state's anti-SLAPP law['s] unique text and structure' conflicts with the Federal Rules." *Paucek* at *8 (citing Matthew L. Schafer & Tanvi Valsangikar, The Application of the New York Anti-SLAPP Scheme in Federal Court, 2 J. Free Speech L. 573, 583 (2023); *Reed v. Chamblee*, 2024 WL 69570, at *6 (M.D. Fla. Jan. 5, 2024), appeal dismissed in part, 2024 WL 806194 (11th Cir. Feb. 27, 2024) ("The specific requirements and language in each state's anti-SLAPP statute

---

[8] An appeal arising from the Eastern District of Pennsylvania is currently pending before the Third Circuit, See *Salaam v. Trump*, 25-2230.  On July 9, 2025 the clerk of the Third Circuit issued an order [Doc. 4] regarding possible dismissal for jurisdictional defects.  The parties submitted responses [Docs. 12 and 13] on the jurisdictional issue on July 23, 2025.  The Third Circuit has not yet acted on the issue.

must be analyzed individually[.]")).   As Bozin Defendants move through analysis of the Paucek ruling, they will compare the provisions of NJ-UPEPA with PA-UPEPA.

The New Jersey court found three primary conflicts between UPEPA and the Federal Rules.   Among them, Judge Bumb concluded that NJ-UPEPA's provision for an immediate interlocutory appeal conflicted with various federal statutes and rules.   *Paucek* at \*9.   The *Paucek* court also found that NJ-UPEPA's presumption for an automatic stay of discovery to conflict with discovery provisions of the Federal Rules.   *Id*.   Both of these reasons may be considered *dicta* as the issues of immediate interlocutory appeal and discovery stays were not raised by the *Paucek* parties and were not relevant to the question of whether NJ-UPEPA's fee-shifting provisions apply.   In any event, neither the immediate appeal provision nor the stay provision of PA-UPEPA are implicated by Bozin Defendants' Special Motion.

More relevantly, The *Paucek* court found that NJ-UPEPA's fee shifting provision, N.J.S.A. 2A:53A-55(a)(3)(A), based upon a plaintiff's failure to establish a prima facie case as to each essential element conflicts federal standards regarding similar burdens under Rules 8, 12 and 56.  *Paucek* at \*8.

That section of NJ-UPEPA provides for dismissal "where the responding party fails to establish a prima facie case as to each essential element of any cause of action in the complaint." *Id*.  Similarly PA-UPEPA grants immunity, *inter alia*, where a plaintiff fails to "establish a prima facie case as to each essential element of the cause of action."  42 Pa.C.S.A. § 8340.15 (1)(i).

Despite the conflict presented by NJ-UPEPA's prima facie case provision, the New Jersey District still found that NJ-UPEPA's provisions shifting fees based on failure to state a cause of action upon which relief can be granted (N.J.S.A. 2A:53A-55 (a)(3)(b)(i)) or for failure to create

genuine issues of material fact  (N.J.S.A. 2A:53A-55 (a)(3)(b)(ii)) "are on all-fours with Federal Rules 12 and 56" as '[t]hey answer the same question about the circumstances under which a court must dismiss a case before trial' in the same was as Federal Rules 12 and 56."  *Paucek* at *10.  Further, "[a]ll a defendant has to do is file an ordinary Rule 12 or Rule 56 motion at the appropriate stage of the litigation and prevail under the familiar standards governing those motions." *Id*.

The New Jersey District decided that this course of action which excluded certain portions of NJ-UPEPA while including others was consistent both with the Legislature's directive to broadly construe NJ-UPEPA and the statute's severability clause.  *Paucek* at 10-11. The *Paucek* court further noted that this was consistent with the Ninth Circuit's directive to "its lower courts to construe anti-SLAPP statutes in a manner 'prevent[ing] the collision of [ ] state procedural rules with federal procedural rules."  *Id*. at 11 (citing *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), as amended, 897 F.3d 1224 (9th Cir. 2018)).

PA-UPEPA confers immunity under the same three standards as NJ-UPEPA:

A.    Failure to establish a prima facie case as to each essential element of a cause of action.  42 Pa.C.S.A. § 8340.15 (1)(i).

B.    Failure to state a cause of action upon which relief can be granted.   42 Pa.C.S.A. § 8340.15 (1)(ii).

C.    There is no genuine issue as to any material fact, and the person against whom the cause of action based on protected public expression has been asserted

is entitled to judgment as a matter of law in whole or in part.   42 Pa.C.S.A. §

8340.15 (2)

PA-UPEPA also contains a legislative mandate of broad construction to achieve its stated goals.

42 Pa.C.S.A. § 8340.12 (4).   While there is not a severability clause within the text of PA-

UPEPA, Pennsylvania's rules of statutory construction provide:

> The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa.C.S.A. § 1925.

In the case at bar, Bozin Defendants ask the Court to dismiss Hackenberg's false light

invasion of privacy and defamation claims on the basis that Defendants are immune under PA-

UPEPA's failure to state a claim provision and as Hackenberg has failed to state a claim under

Rule 12(b)(6).   [Doc. 16, ¶¶ 27, 28, 42, 43]   Additionally, Defendants ask the Court to enter

judgment as a matter of law against Hackenberg under failure to create genuine issues of material

fact tests found in PA-UPEPA and Rule 56.   [Doc. 16, ¶¶ 34, 35, 42, 43]   Defendants suggest that

this Court should be persuaded by the reasoning in *Paucek* to rule that the counsel fee provisions

of PA-UPEPA may be triggered by Hackenberg's failure to state a claim or present genuine

issues of material fact.

2.    *Jakes*.

In *Jakes*, the Western District has shown a heightened level of skepticism that various provision of PA-UPEPA apply in federal court.   The Western District opined that "Section 8340.15 . . . is a procedural rule, not a substantive law. It creates a mechanism for a defendant to resolve a case pre-trial, much like Federal Rules of Civil Procedure 12 and 56."  *Jakes* at *3.

This conclusion is the opposite of the one reached by the *Paucek* court and is curious for two reasons.   First, as discussed above, the General Assembly considered § 8340.15 to be substantive when it made that section immediately effective.   Second, § 8340.15 on its face contains a grant of immunity under certain circumstances.  It does not reference any procedural mechanism by which those circumstances must be demonstrated.  Rather, § 8340.16 provides a procedure (when it becomes effective) by which a defendant *may* but is not *required* to attempt to test his immunity under § 8340.15.  No provision of either § 8340.15 or § 8340.16 prevents a party from testing immunity via a motion to dismiss under Rule 12(b)(6)) or a motion for summary judgment under Rule 56.[9]

As a further note, § 8340.18 does not make an award of counsel fees, costs and expenses contingent upon a defendant successfully bringing a motion under § 8340.16.  Rather, the award provision is triggered "If the party is immune under section 8340.15."  This, no doubt is why the *Jakes* court declined to "reach the issue of whether § 8340.18. is applicable in federal court."

Much of the reason the *Jakes* court ruled as it did is based upon the fact that Youngblood "did not mention Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), nor did he address Rule 12(b)(6)'s legal standard.  Instead, Defendant Youngblood focuses exclusively on the

_____

[9] The same is true of Pennsylvania's state court equivalents at Pa.R.C.P. 1028 and 1035.1, *et seq*.

Uniform Public Expression Protection Act. (See ECF No. 35-2)." *Jakes* at *2. As a result, the Western District declined to "reframe Youngblood's argument to fit within the Rule 12(b)(6) or Rule 56 framework" and permitted Youngblood the opportunity to refile under those rules. *Id*. at *7.

In the case *sub judice*, Bozin Defendants have been careful to frame their motion under the provisions of PA-UPEPA as well as those of Rules 12(b)(6) and 56. As a result, the reasoning in the *Jakes* opinion poses no impediment to this Court's consideration of the question of immunity and entitlement to counsel fees under § 8340.18.

    3.    *Salaam*.

In *Salaam*, Defendant Trump specifically disavows making a motion under Rule 12(b)(6) and claims to make a motion only under UPEPA. *Salaam* at *1. Trump appears to have argued that as he previously won a dismissal without prejudice, PA-UPEPA prevented Salaam from filing an amended complaint. *Id*. at *5. The Eastern District found this argument contrary to the general rule that a district court must permit a curative amendment. *Id*. (internal citations omitted). Following the *Jakes* court, the Eastern District declined to consider Trump's motion in the context of Rule 12(b)(6). *Id.* at *6.

Trump has filed an interlocutory appeal of this ruling. The Eastern District granted Trump's motion to stay discovery pending the appeal, finding that the immunity purportedly conveyed by § 8340.15 constitutes a right not to stand trial. *Salaam v. Trump*, 2025 WL 2375397, note 1 (E.D.Pa. August 15, 2025).

The present case is readily distinguishable from *Salaam* in that Bozin Defendants expressly invoke Rules 12(b)(6) and 56. Further, Hackenberg has already taken three attempts at

framing a complaint which can withstand dismissal.   The Third Circuit has held that where a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile. See *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (citing G*rayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)). An amendment is futile if the complaint, as amended, would not survive a motion to dismiss for failure to state a claim.   See *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002). It is well-established that dismissal without leave to amend is appropriate where a plaintiff has notice of deficiencies and fails to correct them in a first amended complaint. See *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002) (finding that a district court did not abuse its discretion in denying leave to amend for a second time where the plaintiff was on notice of the deficiencies in his complaint and failed to correct them in the first amended complaint).   Accordingly and irrespective of this Court's opinion as to whether PA-UPEPA applies in federal court, the Court may decide Defendant's motion on its merits, enter an order of dismissal with prejudice, and enter an award of counsel fees, costs, and expenses.

## **FRAMING OF THIS MOTION**

As is apparent from the discussion of the *Erie* Doctrine, the state of the law regarding the applicability of PA-UPEPA in federal court is far from settled in the Third Circuit.  Additionally, as noted above, portions of PA-UPEPA are fully effective and others are not.   In light of these factors, and the decisions of the district courts in *Paucek*, *Jakes*, and *Salaam*, Bozin Defendants have framed their Special Motion under the terms of PA-UPEPA as well as Rules 12(b)(6) and 56.  This appears approach appears necessary to avoid waiver of issues.

The sole exception to this broad framing is that Bozin Defendants have elected, at present, not to proceed on the PA-UPEPA theory of immunity by virtue of any failure on Hackenberg's part to state a prima facie case for each essential element of her causes of action. The New Jersey, Eastern Pennsylvania, and Western Pennsylvania Districts appear uniform in their opinion that this provision (§ 8340.15 (1)(i)) is inappropriate in federal court at the pretrial stage.

### 1.    Failure to state a cause of action theories.

PA-UPEPA's failure to state a cause of action provision (§ 8340.15 (1)(ii)) appears to be, as the *Paucek* court suggests of the NJ-UPEPA counterpart, on all fours with Rule 12(b)(6). Bozin Defendants suggest that the relevant standard for determining these issues follows the familiar *Iqbal/Twombly* analysis.  When reviewing the sufficiency of a complaint pursuant to a motion to dismiss under Rule 12(b)(6), the Court must accept as true all material allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010). However, the Court need not accept legal conclusions set forth as factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a civil complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Consistent with the Supreme Court's ruling in *Twombly* and *Ibqal*, the Third Circuit has identified three steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify

any conclusory allegations contained in the complaint "not entitled" to the assumption of truth;

and (3) determine whether any "well-pleaded factual allegations" contained in the complaint

"plausibly give rise to an entitlement to relief." See *Santiago v. Warminster Twp.*, 629 F. 3d 121,

130 (3d Cir. 2010) (citation and quotation marks omitted). A complaint is properly dismissed

where the factual content in the complaint does not allow a court "to draw the reasonable

inference that the defendant is liable for the misconduct alleged." See *Iqbal*, 556 U.S. at 678.

Additionally, a court may not assume that a plaintiff can prove facts that the plaintiff has not

alleged. See *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459

U.S. 519, 526 (1983).

      2.    <u>Genuine issues of material fact theories</u>.

PA-UPEPA's standard for granting immunity due to failure to come forward with genuine

issues of material fact (§ 8350.15 (2)) appears to be cognate with the standard for granting

summary judgment under Rule 56.  This Court has held:

> Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. There is no issue for trial unless sufficient evidence favors the nonmoving party so that a jury could return a verdict for that party. *Id*. at 249.   Rule 56 requires the entry of summary judgment where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

*Samson v. Harvey's Lake Borough*, 881 F.Supp. 138, 141 (M.D.Pa. 1995).

Bozin Defendants acknowledge that a motion for summary judgement is unusual at this early stage of litigation. In *Jakes*, the Western District opined without citation to authority that a summary judgment motion must be filed "after discovery but before trial . . ." *Jakes* at *4. However, Rule 56 simply permits a party to file a motion for summary judgment at any time up to thirty days following the close of discovery. Fed.R.Civ.P. 56 (b). Further, Rule 12 permits but does not require a court to convert a 12(b)(6) motion to a summary judgment motion where "matters outside the pleadings are presented to and not excluded by the court . . ." Fed.R.Civ.P. 12(d). In the event of conversion, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. It follows that a motion for summary judgment at an early part of the proceedings may be unusual, but it is contemplated by the rules.

In the case at bar, Bozin Defendants have specified that they are proceeding under Rule 56. [Doc. 16, ¶¶ 35, 36, 50, 51]. Additionally, Defendants have filed a Statement of Undisputed Material Facts as required by LR 56.1. Hackenberg has had ample notice and an opportunity to marshall any evidence available to her. Accordingly, it would be proper to consider Defendants' Rule 56 motion at this juncture.

## RECORD AVAILABLE TO THE COURT

Due to the compound nature of Bozin Defendants' Special Motion, they have supplemented to record with various exhibits to their Special Motion [Docs. 16-1 through 16-6] and to their Statement of Undisputed Material Facts [Docs. 18-1 through 18-10].

Additionally, Bozin submits an updated affidavit with this Brief as Exhibit 2.[10]   While all of these documents may be considered in the context of a Rule 56 motion, only some of them may be considered when viewing a Rule 12(b)(6) motion.

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based on those documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

In the case at bar, Hackenberg refers to and bases her claims upon several documents which are not attached to the SAC.  These are:

1.    The fightcorruptionpa.com website. [Doc. 15, ¶¶ 39, 41]

2.    Change.org petition "Impeach Judge Lori Hackenberg of Union and Snyder Counties."  [Doc. 15, ¶¶ 40, 41]

3.    The threatened but not actual release of photographs depicting Hackenberg's daughter drinking while underage.  [Doc. 15, ¶¶ 45, 46]

4.    A February 21, 2024 Opinion from the Pennsylvania Superior Court. [Doc. 15, ¶ 30]

In response Hackenberg has provided the following documents:

---

[10] The updated affidavit contains the same factual allegations as the affidavit submitted previously as Doc. 11-2.  The updated document changes the original references to the allegations in the First Amended Complaint to reflect the material in the Second Amended Complaint.

1.     Fightcorruption.com website "About" page [Doc. 16-5] and "Adam Gitter" page [Doc. 16-6].

2.     The Change.org petition [Doc. 16-1] and Update [Doc. 16-2]

3.     Photographs placed on social media by other persons which appear to depict Hackenberg's daughter and others drinking.  [Doc. 18-1]

4.     The February 21, 2024 Superior Court opinion.  [Doc. 18-3]

There should be no reasonable doubt as to the authenticity of any of these documents as their content may be verified by the Court and the parties simply by viewing them online.   Accordingly, the Court may consider them in the context of the 12(b)(6) motion.

Additionally, Bozin has proffered the following documents which are matters of public record:

1.     Docket Sheet for Snyder County CR-17-2024.  [Doc. 16-3]

2.     Docket Sheet for *Gitter v. Gitter*, Union County number 17-0702.   [Doc. 18-2]

3.     July 31, 2023 Opinion filed in *Gitter v. Gitter*.  [Doc. 18-3]

4.     September 1, 2021 motion to recuse filed in *Gitter v. Gitter*.  [Doc. 18-4]

5.     May 15, 2023 motion to recuse filed in *Gitter v. Gitter*.  [Doc. 18-5]

6.     June 30, 2023 motion to recuse filed in *Gitter v. Gitter*.  [Doc. 18-6]

Each of these may be considered in the context of a 12(b)(6) motion.

Finally, Bozin Defendants have offered a May 11, 2021 article from the Daily Item [Doc. 18-7] and various letters sent by Hackenberg's previous counsel to a political opponent, his supporters, and the press [Docs. 18-8 to 18-10].  While it appears that an award of counsel fees, costs and expenses is compulsory rather than discretionary under § 8340.18, these documents show a pattern of attempts on Hackenberg's part to intimidate those who speak against her.

Having concluded the discussion of preliminary matters, Bozin Defendants will move to a discussion of the substantive questions presented by their Special Motion.

## QUESTIONS PRESENTED

I.      WHETHER THE COURT SHOULD DISMISS HACKENBERG'S FALSE LIGHT INVASION OF PRIVACY CLAIM FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED OR, IN THE ALTERNATIVE, ENTER JUDGMENT AS A MATTER OF LAW FOR FAILURE TO ADDUCE GENUINE ISSUES OF MATERIAL FACT.

II.     WHETHER THE COURT SHOULD DISMISS HACKENBERG'S DEFMATION CLAIM FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED OR, IN THE ALTERNATIVE, ENTER JUDGMENT AS A MATTER OF LAW FOR FAILURE TO ADDUCE GENUINE ISSUES OF MATERIAL FACT.

III.    WHETHER THE COURT LACKS SUBJECT MATTER JURISDICTION.

**ARGUMENT**

**I.    THE COURT SHOULD DISMISS HACKENBERG'S FALSE LIGHT INVASION OF PRIVACY CLAIM FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED OR, IN THE ALTERNATIVE, ENTER JUDGMENT AS A MATTER OF LAW FOR FAILURE TO ADDUCE GENUINE ISSUES OF MATERIAL FACT.**

In Pennsylvania, the elements of a false light claim are "'(1) publicity, (2) given to private facts, (3) which could be highly offensive to a reasonable person, and (4) which are not of legitimate concern to the public.'"  *Smith v. Borough of Dunmore*, 633 F.3d 176, 182 (3d Cir. 2011) (citing of *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa.Super.1997)).   The Eastern District of Pennsylvania has noted that "Pennsylvania courts 'consistently apply the same analysis' to defamation and false light claims 'when the causes of action are based on the same set of underlying facts.'"  *Suniaga v. Downington Area School District*, 504 F.Supp.3d 430, 454 (E.D. Pa. 2020) (citing *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3rd Cir. 2014)).

As a result, the argument made below concerning Hackenberg's defamation claim will apply to the false light claim.   However, Pennsylvania jurisprudence contains two nuanced distinctions between false light invasion of privacy and defamation.

First, the Superior Court has long held that A person's "stature in the community as a public figure result[s] in relinquishment of insulation from scrutiny of his public affairs."  *Neish v. Beaver Newspapers, Inc.*, 398 Pa.Super. 588, 598, 581 A.2d 619, 625 (Pa.Super. 1990) (citing See *Harris by Harris v. Easton Publication Co*. 335 Pa.Super. 141, 483 A.2d 1377 (1984);

*Aquino v. Bulletin Co.*, 190 Pa.Super. 528, 154 A.2d 422 (1959); *Hull v. Curtis Publishing Co.*, 182 Pa.Super. 86, 125 A.2d 644 (1956)).  As a result, public officials cannot avail themselves of false light invasion claims where the defendant's expression is related to the official's public life and conduct in office.

In the case at bar, nearly every single communication Hackenberg attempts to connect to Bozin relates to Hackenberg's activities as a judge.   This is particularly true of the fightcorruptionpa.com website, the Change.org petition, the facebook page, the use of hashtags, and the towed banner calling for Hackenberg's impeachment.   Hackenberg's status as a public officials bars her claims for false light invasion of privacy as to each of these alleged communications.

The second key distinction is:

> "Publicity," for the purposes of a false light invasion of privacy claim, requires more than the "publication" required to sustain a claim for defamation. *Harris*, 483 A.2d at 1384 (citing Rest.2d Torts § 652D). Rather, it requires that "the matter is made public by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.*; V*ogel v. W.T. Grant Co.*, 458 Pa. 124, 327 A.2d 133, 137 (1974) ("The disclosure ... must be a public disclosure, and not a private one; there must be, in other words, publicity. It is an invasion of his rights to publish in a newspaper that the plaintiff did not pay his debts, or to post a notice to that effect in a window on the public street, or to cry it aloud in the highway, but not to communicate the fact to the plaintiff's employer, or to any other individual, or even to a small group....") (quoting W. Prosser, Handbook of the Law of Torts § 117 at 810–12 (4th ed.1971)). Disclosure to only one person is insufficient, *Degiovanni Sharp v. Whitman Council, Inc.,* No. 05–4297, 2006 WL 2261623, at *10 (E.D.Pa. Aug. 3, 2006), whereas media publication to as few as seventeen people has been held sufficient to constitute publicity as a matter of law. *Harris*, 483 A.2d at 1385–86; see also *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa.Super.1997) (noting that "publicity" does not include notifying those who have an interest in the matter).

*Schatzberg v. State Farm Mut. Auto. Ins. Co.*, 877 F.Supp.2d 232 (E.D.Pa. 2012).

In the present case, the only allegation that Hackenberg makes against Bozin that arguably does not relate to Hackenberg's status as a public officials bars is the one relating to underage drinking by Hackenberg's daughter.[11]  [Doc. 15, ¶¶ 46-46]  However, Hackenberg does not allege that Bozin actually published images or information relating to the alleged drinking. Hackenberg merely alleges that Bozin threatened in a voice message to put out an ad in the local newspaper if he got a photo of Hackenberg's daughter drinking while underage.  [Doc. 15, ¶ 45]  There is no allegation that Bozin actually took out the ad or otherwise communicated to anyone about the alleged drinking other than by voice message to Hackenberg herself.

Hackenberg further alleges that Bozin "attempted to blackmail" Hackenberg with pictures in Bozin's possession.  [Doc. 15, ¶ 46]  As unsavory as this activity might be, there is again no allegation that Bozin published any images of Hackenberg's daughter to the public. [Doc. 15, ¶ 46]  Accordingly, Hackenberg has entirely failed to satisfy the requirement of broad publication with respect to the only communication which arguably pertains to private matters and her false light claim must be dismissed.

Should the Court determine that Hackenberg's false light claim survives the public officials bar and the requirement of general publication, the arguments below regarding defamation will still mandate dismissal.[12]

---

[11] Bozin Defendants do not concede that this is not a matter of public interest.  Whether a judicial officer permits underage drinking at her residence may well be a matter of concern to the electorate.

[12] The Court should note that, in making the argument against the False Light claim, Bozin Defendants have relied solely on material which may be considered in the context of a 12(b)(6) motion.

## II.  THE COURT SHOULD DISMISS HACKENBERG'S DEFMATION CLAIM FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED OR, IN THE ALTERNATIVE, ENTER JUDGMENT AS A MATTER OF LAW FOR FAILURE TO ADDUCE GENUINE ISSUES OF MATERIAL FACT.

.      In an action for defamation, the plaintiff has the burden of proving, when the issue is

properly raised:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication.
> (7) Abuse of a conditionally privileged occasion.

42 Pa.C.S.A. § 8343 (a) (1-7).

"Procedurally, a trial court at the outset should decide whether a statement is capable of a

defamatory meaning." *Graboff v. Colleran Firm*, 744 F.3d 128, 135 (3d Cir. 2014)  (citing *Tucker*

*v. Fischbein*, 237 F.3d 275, 281 (3d Cir. 2001).   "If the court determines that a statement can

support such a meaning, the jury then must decide 'whether the recipient actually understood the

statement to be defamatory.' *Id.* at 136 (citing *Tucker* at 281-82)).   "A statement is defamatory if

"it tends so to harm the reputation of another as to lower him in the estimation of the community

or to deter third persons from associating or dealing with him." *Id*.   "[T]the statement must do

more than merely embarrass or annoy the plaintiff; it must provoke " 'the kind of harm which

has grievously fractured [one's] standing in the community of respectable society.'   *Id*. (citing

*Tucker v. Phila. Daily News*, 577 Pa. 598, 848 A.2d 113, 124 (2004)).

The Eastern District has provided the following summary regarding the law on whether a

statement is defamatory:

Only statements of fact, not expressions of opinion, can support an action for defamation." *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. 2005). Despite this general rule, an opinion that could reasonably be understood to imply undisclosed defamatory facts may support a cause of action based upon those unenumerated facts. See *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001). An opinion that could not reasonably be construed as implying such facts will not substantiate a defamation claim. See *Cornerstone Sys. v. Knichel Logistics, L.P.*, 255 F. App'x 660, 665 (3d Cir. 2007). Whether a statement is a fact or an opinion is a question of law. *Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F. App'x 162, 168 (3d Cir. 2014).

Cases in which challenged statements feature equivocal or cautionary language are routinely dismissed because the statements are non-actionable opinion. See, e.g., *Purcell v. Ewing*, 560 F. Supp.2d 337, 340 (M.D. Pa. 2008) (finding statements that alumnus looked like "someone accused of child molestation" was non-actionable opinion); *In re Maze*, 1999 WL 554600, at *2 (E.D. Pa. July 16, 1999) (finding statement in letter that plaintiff failed to pay taxes, "which money he seemingly misappropriated from his employees[,]" was non-actionable opinion); see also *Reardon v. Allegheny College*, 926 A.2d 477, 484 (Pa. Super. 2007) (finding use of the phrase "might have" rendered statement non-actionable because it was "a strong indication that this statement [was] merely one outlining possibilities").

*Pace v. Baker-White*, 432 F.Supp.3d 495, 512 (E.D.Pa. 2020)    Additionally, the Pennsylvania Superior Court has held that a statement is not libelous when it is "'no more than rhetorical hyperbole' or 'a vigorous epithet.'"   *Redding v. Carlton*, 223 Pa.Super. 136, 139, 296 A.2d 880, 881 (1972) (citing *Greenbelt Cooperative Publishing Ass'n. v. Bresler*, 398 U.S. 6, 14 (1970)).

It is axiomatic that a public figure bears the burden of proving actual malice.  *St. Sturin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1317 (3d Cir. 1994).   "'Actual malice'" in constitutional law is "'a term of art denoting deliberate or reckless falsification.'" *Pace* at 513 (citing *Masson v. New Yorker Magazine*, 501 U.S. 496, 499 (1991).  "For actual malice, 'neither negligence nor failure to investigate, on the one hand, nor ill will, bias, spite, nor prejudice, on

the other, standing alone, [are] sufficient to establish either a knowledge of the falsity of, or a reckless disregard of, the truth or falsity of the materials used.'" *Id*. (citing *St. Sturin* at 1317).

"'Reckless disregard' requires a showing that the defendant either 'in fact entertained serious doubts as to truth of [the] publication,' *St. Amant v. Thompson*, 390 U.S. 727, 731, 8(1968), or had a 'high degree of awareness of ... probable falsity[,]' *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). *Id.*

This standard is almost insurmountably high. As the Eastern District noted:

> In the wake of *Iqbal* and *Twombly*, "adequately pleading actual malice is an onerous task[.]" *514 *Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*, 2015 WL 1163787, at *2 (M.D. Pa. Mar. 13, 2015); see, e.g., Iqbal, 556 U.S. at 687, 129 S.Ct. 1937 ("Rule 8 does not empower [plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss."). 15 And it is one that regularly results in early dismissal of an action. See, e.g., *McCafferty v. Newsweek Media Grp., Ltd.*, 2019 WL 1078355, at *6 (E.D. Pa. Mar. 7, 2019) (dismissing complaint with prejudice, in part because plaintiffs "failed to sufficiently allege actual malice"); *Earley*, 2015 WL 1163787, at *3 (dismissing complaint with prejudice for "fail[ing] to provide any facts that could plausibly demonstrate that defendant acted with actual malice"); Biro v. Conde Nast, 807 F.3d 541, 546-47 (2d Cir. 2015) (affirming dismissal of defamation action where plaintiff's nonconclusory allegations against defendants fell "short of raising a plausible inference of actual malice"); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 57-58 (1st Cir. 2012) (affirming dismissal of complaint where none of plaintiff's pleadings "plausibly suggested that defendant acted with actual malice"); *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (affirming dismissal of defamation action on the pleadings for failure to plausibly suggest actual malice); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013)

*Pace* at 514-515.

With these standards in mind, Bozin Defendants will demonstrate that Hackenberg has failed to plead that Bozin made defamatory statements about Hackenberg, that in

some cases, Bozin did not actually publish the statements, and that Hackenberg fails to plead actual malice.[13]

A.    Failure to plead defamatory statements.

1.    Fightcorruptionpa.com.

Bozin concedes that he published the fightcorruptionpa website and that it pertains, in part to Hackenberg.  However, the website contains nothing but statements of opinion, hyperbole and vigorous epithet.  On its "About" page, it asserts that under the judgeship of Hackenberg, "our community is facing unprecedented threats.  Corruption and incompetence within our local justice system endanger the well-being of our children and families."  [Doc. 16-5, p. 1]  The same page indicates that Hackenberg "made dangerous and life-altering decisions, including the tragic case of Adam Gitter, whose life was cut short due to her negligence.  Her luxurious lifestyle stands in stark contrast to the devastation she leaves behind."  [Doc. 16-5, p. 1]  All of these statements are nothing more that rhetorical flourishes which are common in sharp criticism of elected officials.

The Adam Gitter page gives an editorialized account of the accusations Elena Belogolovsky levels against the Snyder-Union County courts in general and Hackenberg in particular.  [Doc. 16-6, pp. 1-3]  The entire page is replete with the qualifying works like "alleging" and "Belogolovsky asserts . . ."  These are precisely the sort of equivocal language which takes the statements out of the realm of fact and into the realm of opinion

_____

[13] With respect to actual malice, it should be beyond question that Hackenberg, as a sitting Common Pleas judge, is a public official who bears the heightened burden.

and conjecture.   See *Alaskasland.com, LLC v. Cross*, 357 P.3d 805, 821 (Alaska 2015); *Others First, Inc. v. Better Business Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 582 (8th Cir. 2016)   The most serious accusations the Adam Gitter page directs toward Hackenberg are that she allegedly relied on a questionable custody evaluation and that Hackenberg systematically disadvantaged Belogolovsky.   [Doc. 16-6, p. 2]   Neither of these things is anything more than opinion and is hardly defamatory.

2.   <u>Impeach Judge Lori Hackenberg of Union and Snyder Counties, PA petition</u>.

Hackenberg's allegations concerning the Change.org petition are opaque at best.   On the one hand Hackenberg refers to the petition as Bozin's.   [Doc. 15, ¶ 40]   On the other, Hackenberg merely criticizes Bozin for linking to it. [Doc. 15, ¶ 41]

The text of the petition itself belies Hackenberg's claims as to Bozin's ownership.   The petition itself was created on September 9, 2023 [Doc. 16-1, p. 6], more than two months prior to Bozin's arrest in Snyder County on November 20, 2023 [Doc. 16-3, p. 1] and almost five months prior to the issuance of the bench warrant on February 1, 2024 [Doc. 16-3, p. 3].   Even the update page featuring the bloody handprints image was posted on November 5, 2024 prior to Bozin's arrest.   [Doc. 16-4]   This chronology is relevant as Hackenberg herself asserts that her issuance of a bench warrant against Bozin prompted his alleged communications including the petition.   [Doc. 15, ¶¶ 4, 5]   The clear fact that the petition and the update were created prior to Bozin's contact with Hackenberg as a judge belie Hackenberg's allegations that Bozin created them in retaliation.

40 of 48

Additionally, the petition purports to be the work on one of the "Jane Smith." [Doc. 16-1, p. 3; Doc. 16-4, p. 1]   Hackenberg offers no factual assertion that Bozin is "Jane Smith." Additionally, the text of the petition contains a lengthy narrative, written in the first person, describing circumstances remarkably similar to those of which Elena Belogolovsky complains. [Doc. 16-1, pp. 2-3]   The implication of all of this is that the Bozin Defendants did not publish the petition are not liable for statements made in it.

Hackenberg's allegation that Bozin Defendants republished the petition by linking to it on the fightcorruptionpa.com website are similarly unavailing for two reasons.   First, the petition consists entirely of opinions concerning the case of "Jane Smith" and calls to action.   Second, the Third Circuit has expressed considerable skepticism about the notion that posting a link constitutes a republication.   See *In re Philadelphia Newspapers, LLC*, 690 F.3d 161 (3d Cir. 2012).   Accordingly, Hackenberg has failed to state a claim with respect to the petition. Alternatively, Bozin denies creating the petition or exercising any control over it whatsoever . [Exhibit 2]   To the extent Hackenberg fails to come forward with admissible material suggesting Bozin did, Hackenberg has failed to create genuine issues of material fact.

3.    Various hashtags.

Hackenberg baldly alleges that Bozin Defendants have used the following hashtags: #kidsforcash, #courtcorruption, #endjudicialabuse, and #savekids.   [Doc. 15, ¶ 42]  Aside from the fact that none of these can be understood to be an assertion of fact, Hackenberg fails to plead, through three iterations of her complaint, a single actual example of their use.   Hackenberg furnishes the Court with no information about when, where, or how the hashtags were supposedly used.   As a result, the Court cannot asses the hashtags in context and cannot make a

determination whether Hackenberg has pled that they apply to her or were understood by recipients as applying to her.

    4.    <u>"Manipulation" of the "Impeach Lori Hackenberg" social media page.</u>

Hackenberg bluntly alleges that Bozin has manipulated the Impeach Lori Hackenberg" social media page.  [Doc. 16, ¶ 43]  Hackenberg's SAC is entirely silent about what form this manipulation took or how it resulted in publication of defamatory material.  It is possible that this somehow relates to Hackenberg's equally conclusory allegations that Bozin manipulated Belogolovsky.  [Doc. 16, ¶ 34]  However, this makes no sense as the record in Belogolovsky's custody case, as set forth in the factual matter above, demonstrates Belogolovsky's hostile animus toward Hackenberg (including accusations of anti-semitic behavior) long before Hackenberg issued the bench warrant against Bozin.

Simply, the Court is entitled to more precise factual allegations on this point.  After three iterations of her complaint, Hackenberg cannot provide them.

    5.    <u>The "CORRUPTION" image.</u>

It is undisputed that Bozin Defendants created the image headed "CORRUPTION" (with the exception of the QR code) and depicted at SAC ¶ 43.  This image is utterly incapable of defamatory meaning in that is a typical and perhaps hyperbolic expression of political discontent.   The link to the fightcorruptionpa.com website does nothing to bolster Hackenberg's claims as it merely links to already published material.  See *In re Philadelphia Newspapers, LLC*, 690 F.3d 161 (3d Cir. 2012).

6.      <u>Impeach Judge Hackenberg banner</u>.

The parties do not dispute that Bozin hired an aircraft to tow a banner calling for Hackenberg's impeachment.  This was an exercise of pure political speech.  To consider it defamatory would open the floodgates to allow every displeased politician to sue disgruntled citizens without end.  This is the very sort of behavior that PA-UPEPA was enacted to combat.

7.      <u>Underage drinking photos</u>.

As indicated above, there is absolutely no allegation that Bozin Defendants actually published the underage drinking photos to anyone or otherwise communicated about them to any person other than Hackenberg.  Further, the images cannot be understood to be defamatory or untrue as they appear to depict underage drinking.

8.      <u>Post-complaint social media posts</u>.

Hackenberg points to several post-complaint social media posts made by Bozin.  [Doc. 15, ¶¶ 55, 59]  These posts, taken together, amount to nothing more that Bozin's opinion that he is the victim of some sort of conspiracy, the nature of which is entirely murky and unspecified.  Complaints such as these are hardly uncommon from persons who rightly or wrongly believe they are mistreated by the system.  They cannot be understood to by accusations of fact and are not defamatory.

B.      <u>Actual malice</u>.

Hackenberg repeatedly asserts that Bozin's conduct, and that of his media companies, is motivated by ill will resulting from Hackenberg's issuance of a bench warrant.  Aside from the fact that ill will is not enough to constitute actual malice for purposes of defamation, the chronology of development of many of the statements attributed by Hackenberg to Bozin shows

that they were made well before Bozin was even arrested. As Hackenberg has failed to adequate plead let alone prove actual malice, her SAC must be dismissed.

Should the Court find dismiss this case under Rule 12(b)(6) or grant judgment under Rule 56, the Court should then issue an award of counsel fees, costs and expenses as required by 42 Pa.C.S.A. § 8340.18 (a). This is appropriate as Bozin Defendants will have demonstrated immunity under 42 Pa.C.S.A. § 8340.15 (1)(ii) and (2). Bozin Defendants will provide a statement of fees, costs and expenses, together with any additional briefing the Court may deem necessary as to entitlement, within such time as the Court may direct.

III.    THE COURT LACKS SUBJECT MATTER JURISDICTION.

Hackenberg invokes the diversity jurisdiction of this Court under 28 U.S.C. § 1332. [Doc. 15, ¶ 17] The United States Code provides that "[t]he district courts shall have jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between -- citizens of different States." 28 U.S.C. § 1332 (a)(1).

It is well settled that "[t]o show personal jurisdiction, a plaintiff may rely on the allegations in the complaint, affidavits, or other evidence." *Goldfarb v. Kalodimos*, 539 F.Supp.3d 435, 448 (E.D.Pa. 2021)(citing *Metcalf v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). "Where ... the court chooses not to conduct an evidentiary hearing, a plaintiff need only demonstrate a prima facie case of jurisdiction to defeat a motion to dismiss." *Id*. (citing *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 142, n.1 (3d Cir. 1992). Further, "[i]n deciding in a motion to dismiss for lack of personal jurisdiction,

the Court must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Id.* Where state practice does not permit a demand for specific sum, as in Pennsylvania, the jurisdictional requirement is satisfied where "the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional threshold." *Goldfarb* at 449-50 (internal citations omitted).

"When both actual and punitive damages are recoverable, punitive damage are properly considered in determining whether the jurisdictional amount has been satisfied." *Id* at 450 (citing *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993). Additionally, "claims for punitive damages 'will generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum.'" *Id* (citing *Huber v. Taylor*, 532 F.3d 237, 244 (3d Cir. 2008).

In *Goldfarb*, the Eastern District examined the requirements of § 1332 in the context of claims against a blogger for five defamatory social media posts. The Court noted that the plaintiff requested actual damages of not less than $50,000 together with exemplary and punitive damages together with costs and attorney's fees. *Id.* The plaintiff alleged only that he suffered "irreparable damage to his reputation ... including loss of credibility as a professor of medicine and as a physician, and embarrassment and humiliation." *Id.* The *Goldfarb* court looked to plaintiff's income of $100,000 from plaintiff's professorship as well as income from medical practice and consulting services. *Id.* Base on the income figures and the allegations of harm, the Eastern District concluded that actual damages, if proved, would likely exceed the jurisdictional threshold. *Id.* In consideration of this, together with the availability of costs and counsel fees as well as the difficulty at the pleading stage of "plac[ing] a monetary value on [p]laintiff's

purported reputational and professional harm," the *Goldfarb* court found that the requirements for diversity jurisdiction were met. *Id* at 451.

In the case at bar, however, Hackenberg has offered no indication that her income has suffered in any way as a result of Bozin's alleged communications. In fact, Hackenberg cannot possibly make that assertion as she pleads that she was elected to the Court of Common Pleas in 2011. [Doc. 15, ¶ 19] Common pleas judges enjoy a term of 10 years. Pa. Cons. Art. V, § 15. Short of impeachment, which Hackenberg does not allege has resulted from Bozin Defendants' activities, Hackenberg is safe in both office and income for several more years. Unlike the plaintiff in *Goldfarb*, Hackenberg cannot substantiate any economic loss upon which she would predicated an award of punitive damages. Accordingly, the Court should find that Hackenberg has failed to meet the jurisdictional threshold and dismiss the case without prejudice to refile in state court.

## **CONCLUSION**

For the foregoing reasons, Defendants Daniel Bozin, Bozin Media Group, LLC and Bozin Holdings, LLC respectfully request that the Honorable Court grant their Special Motion and enter an order dismissing Plaintiff Lori Hackenberg's Second Amended Complaint with prejudice and awarding counsel fees, court costs, and expenses of litigation; or, in the alternative, dismissing the Second Amended Complaint for lack of subject matter jurisdiction without prejudice to Hackenberg's right to refile in state court.

Respectfully submitted

**KOLMAN LAW, PC**

DATE:  August 18, 2025                    /s/ Timothy M. Kolman

Timothy M. Kolman, PA51982
tkolman@kolmanlaw.com

Timothy A. Bowers, PA77980
tbowers@kolmanlaw.com

Kymberley L. Best, PA94596
kbest@kolmanlaw.com
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134
*Attorneys for Defendants.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that I have this 18 th day of August 2025 served a true and correct

copy of the foregoing document via the Court's electronic filing system upon the following:

James E. Beasley, Jr., Esquire
Louis F. Tumolo, Esquire
Andrew M. Marth, Esquire
Lane R. Jubb, Jr., Esquire
Counsel for Plaintiff

Timothy A. Bowers, PA77980